```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
JUNE HARPER,                                                :
                                                            :
                              Plaintiff,                    :    **MEMORANDUM DECISION AND**
                                                            :    **ORDER**
               - against -                                  :
                                                            :    16-cv-4178 (BMC)
DETECTIVE ARTHUR LEAHY;                                     :
DETECTIVE DANIEL KIRK; DETECTIVE                            :
CHRISTOPHER TEHAN; DETECTIVE                                :
CHING NIEH; THE CITY OF NEW YORK;                           :
POLICE OFFICER JOHN DOE,                                    :
                                                            :
                              Defendants.                   :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

When police tried to enter the home of a suspect to execute an arrest warrant, the suspect's mother refused to let them in. She physically blocked the officers' entry into the home and the police had to pull her out of the way to get by her, at which time she tried to kick one of the officers. When the officers tried to handcuff her for interfering, she resisted arrest by screaming, kicking her legs, and flailing her arms.

The arrest warrant gave the officers the right to enter the suspect's home to see if he was there, and any force the police used to get past and then subdue his mother was *de minimis* and thus reasonable under the circumstances. Accordingly, the officers are entitled to summary judgment on the mother's claims under 42 U.S.C. § 1983 for false arrest and excessive force.

## BACKGROUND

The following facts are undisputed.

Defendant Arthur Leahy ("Det. Leahy"), a detective with the Warrant Squad of the New York Police Department, was assigned to the investigation of a burglary suspect named Kedar

Harper. His specific task was to follow up on an investigation card, known as an "I-card." The I-card listed Harper as residing at 910 Caton Avenue, Apt. 52, Brooklyn (the "subject premises"). Leahy ran several computer searches in an effort to get information concerning Harper. Specifically, he did a general online search for information and found nothing. He also checked the New York City Department of Corrections database and found that Harper was not in custody. He further checked to see if he was on parole or probation; both checks came back negative. He also checked the database for the Narcotics Investigative Tracking of Recidivist Offenders ("NITRO") and didn't find anything on Harper in that database either. Det. Leahy read all of the DD-5s (police reports) in connection with the investigation of Harper, but they did not disclose any additional information apart from the I-card.

He also searched what is known as the ADW, a database that compiles an individual's I-card and warrant history. One of the sources from which ADW pulls information is another database called CRIMS, which is populated and maintained by the New York State Unified Court System.[1] The CRIMS database identifies outstanding warrants based on the name of a defendant or his case number.

The ADW database disclosed an outstanding bench warrant for Harper's arrest that the New York City Criminal Court had issued about six months prior to Leahy's involvement in this matter. Like his I-card, the warrant showed Harper residing at the subject premises, although it did not list an apartment number. It also contained Harper's picture.

Although not known to Det. Leahy with certainty at the time, Harper was indeed living at the subject premises. In fact, he had lived there with his mother his entire life, except the times during which he had been incarcerated.

---

[1] It is not entirely clear from Det. Leahy's affidavit, but this may be a database also known as "webcrims," https://iapps.courts.state.ny.us/webcrim_attorney/AttorneyWelcome, which makes information on criminal cases, both historical and upcoming appearances, available to attorneys, defendants, and members of the public.

One morning at about 7:00 a.m., Det. Leahy went to the subject address with defendant detectives Kirk, Tehan, and Nieh to arrest Harper. They knocked on the door and plaintiff, who is Harper's mother, answered. Det. Leahy heard a male voice inside. He asked plaintiff if Harper was there and plaintiff said he was "not home." She confirmed that Harper was her son and when shown the arrest warrant with his picture on it, she further confirmed that the warrant was for Harper. When Det. Leahy told plaintiff that they were going to enter the premises and look for him, plaintiff asked to review the warrant. Det. Leahy handed plaintiff the warrant and permitted her to close the apartment door to retrieve her glasses and, after returning, to review it.

Plaintiff expressed the view that the arrest warrant did not give the police the right to enter the apartment and started to close the door. Det. Leahy inserted his foot or himself to stop the door from closing and he pulled plaintiff out of the apartment by her arm so he could get in. One of the other detectives took her arm behind her back to place handcuffs on her and plaintiff kicked at him. Plaintiff acknowledges that from that point on she fought vigorously to prevent the police from handcuffing her – yelling, screaming, kicking and flailing her arms – but ultimately, defendants overpowered her and placed her in handcuffs.

Plaintiff went to trial on charges of resisting arrest and obstruction of governmental administration and was acquitted.

## DISCUSSION

### I. False Arrest

One fundamental legal point drives the outcome of plaintiff's claim for false arrest – if police officers have a reasonable belief that a person subject to an arrest warrant may be in his home, they have the right to enter to see if the suspect is there and attempt to make the arrest. See Payton v. New York, 445 U.S. 573, 603 (1980) ("[A]n arrest warrant founded on probable

cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within"). Moreover, the location into which police enter to execute an arrest warrant need not actually be the suspect's home, nor do the police require probable cause to believe it is his home; the police need only "reasonably believe" that it is his home. "Agents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present." U.S. v. Lauter, 57 F.3d 212, 214 (2d Cir. 1995). I do not see how any jury could find that the officers in this case lacked a reasonable belief that plaintiff lived in the subject premises and might be in it.

Plaintiff's argument to the contrary is largely based on her claim that the arrest warrant was facially defective and thus did not give the police the right to enter the residence to affect the arrest. It was facially defective because, according to plaintiff: (1) it was signed by the Clerk, not a Judge; (2) it did not state that the warrant was issued pursuant to a determination of probable cause on the face of the warrant; and (3) it did not expressly authorize the police to enter the premises listed on the warrant. As a result of these alleged deficiencies, plaintiff reasons that her arrest followed from illegal conduct by the police and thus her conduct cannot constitute probable cause for her arrest since she was merely defending herself from illegal conduct.

Although I of course understand plaintiff herself not being well versed in the law, it is hard to understand how plaintiff's counsel can advance these points on her behalf, as they are frivolous. What appears to have happened is that plaintiff told her counsel that she didn't think the police could enter her home because the warrant didn't say they could. As she testified, "Yeah, they said they don't have a search warrant, but this warrant that we have allow us to come

4

into your apartment. But I know better than that." In fact, plaintiff didn't know better; she just thought she did. But instead of explaining to his client that her view of the law was mistaken, plaintiff's counsel inexplicably decided to run with it.

Defendants were executing a *bench warrant*. Bench warrants are issued because a judge sees with his or her own eyes that a defendant has failed to appear in court despite being summoned thereto. Because the failure to appear in itself is a crime or a contempt of court subjecting the defendant to arrest, a bench warrant is necessarily based on probable cause. See N.Y. Crim. Proc. L. § 1.20(30) ("The function of a bench warrant is to achieve the court appearance of a defendant in a pending criminal action for some purpose other than his initial arraignment in the action.").

When a defendant fails to appear, the Judge simply turns to the Clerk and says, "issue a warrant," and, in state court practice, the Clerk signs the warrant under authority of the Judge. The probable cause is obvious because it happened in the presence of the Judge. And courts obviously must have power to bring those people before them who have chosen not to appear when summoned, or else nothing could compel a summoned defendant to appear.

Plaintiff cites no authority for the proposition that the Judge must not only direct the issuance of the warrant, but personally sign it, at least where, as here, there is no allegation that the Clerk acted *ultra vires*. The Supreme Court has squarely rejected plaintiff's argument. See Shadwick v. City of Tampa, 407 U.S. 345, 352 (1972) (holding that clerks of the court may issue warrants pursuant to state statutes granting such authority); N.Y.C. Crim. Ct. Act § 23(a) (authorizing Clerks of the New York City Criminal Court to issue judicial process). Acceptance of plaintiff's argument would lead to the invalidation of every bench warrant issued by the New

5

York City Criminal Court. No experienced practitioner could advance the argument that plaintiff's lawyer has advanced here.

Plaintiff similarly cites no authority for the proposition that the warrant must show on its that a judge made a determination of probable cause. That is simply not the case. "[A]ll an arrest warrant must do is identify the person sought." Lauter, 57 F.3d at 215. In the case of an ordinary arrest warrant, the required probable cause has to be shown in the *ex parte* application to the magistrate judge, which may be either oral or written, but there is no constitutional requirement that the issuing magistrate judge make a statement on the face of the warrant that he has found probable cause. Indeed, the official form for a federal arrest warrant contains no such statement. See Administrative Office of the United States Courts, Form 442 (Arrest Warrant). Moreover, in the case of a bench warrant, as noted, even an external showing by written or oral application is unnecessary because the judge has seen the offense – *i.e.*, the defendant failed to answer the calendar call.

Plaintiff's other point, that an arrest warrant grants no right of entry for purposes of execution unless it is expressly provided on the face of the warrant, is defeated by the well-established case law cited above.

The only other point plaintiff raises is that the information as to Harper's address on the bench warrant and the I-card was "stale" as Det. Leahy did not know the provenance of that information. There is some irony in this argument considering that not only were the subject premises, in fact, Harper's home, but they were the only home that he had ever known. But even putting aside that reality, as obviously we cannot use hindsight in measuring the reasonableness of the Det. Leahy's belief at the time, he had plenty of corroborative evidence to form the belief that turned out to be correct.

6

First, Det. Leahy had searched multiple databases to find Harper, and the address of the subject premises was the only address that came up. Second, the court had issued the warrant, containing the address of the subject premises, only six months earlier. Third, the woman who answered the door – plaintiff – identified herself as Harper's mother, as far from a stranger as one could get, and further identified that the warrant was for her son. This was at least circumstantial evidence that the address that was listed in the database for him was correct. Fourth, plaintiff specifically stated to the officers that Harper was "not at home," thus confirming that he did in fact live there.[2] Fifth, the officers heard a male voice inside when they knocked on the door, which gave them reason to believe that Harper might be inside. And, in any event, the Second Circuit has "rejected the contention that the police must first conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence." U.S. v. Terry, 702 F.2d 299, 319 (2d Cir. 1983) (citing United States v. Manley, 632 F.2d 978, 984 (2d Cir. 1980)). Sixth, when a suspect's mother says that he is "not at home" at 7 a.m., only the most naïve police officer would accept that statement at face value, because if a suspect's mother will not dissemble for him, who will?

Significantly, although plaintiff refers to the police inquiry into Harper's residence as "lackluster," she nowhere offers any suggestions for what more they should have done. This may be because the reality is, as noted above, that anything more would have led them to the same address.

Once it is clear that the police did nothing wrong in seeking entry into the subject premises to attempt to execute the arrest warrant, plaintiff's false arrest claim collapses. Plaintiff

---

[2] Plaintiff denies that she stated that Harper was "not home," despite admitting to saying these exact words during her deposition. In her deposition, plaintiff first testified that she informed Det. Leahy that Harper was "not there." However, later in the deposition, plaintiff clarified that she told Det. Leahy that Harper "wasn't home." When defense counsel followed up with plaintiff and asked, "Those are the words you used, he is not home?" plaintiff responded, "Yes."

7

does not deny that after inspecting the warrant, she refused to admit defendants and sought to close the door on them. She also does not deny that when Det. Leahy pulled her into the hallway so he could get in, she tried to kick one of the other officers. She acknowledges that she fought tooth and nail to avoid being placed in handcuffs, to the point where the police had to lift and carry her down the stairs kicking and screaming. We do not need to spend any time discussing whether her conduct constituted obstruction of government administration, resisting arrest, assaulting a police officer, or other crimes. There was plenty of probable cause to arrest her for something, and that ends her claim for false arrest.

## II. Excessive Force

Determining whether the force applied to effect an arrest rises to the level of "excessive force," as plaintiff claims it does here, requires a consideration of whether the force used was "reasonable" under the Fourth Amendment given the facts and circumstances of the particular case. Graham v. Connor, 490 U.S. 386, 395-97 (1989). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. The "reasonableness" standard is an objective one considered from the perspective of a "reasonable officer on the scene." Id. The standard does not require police officers to use the "least restrictive means of responding to an exigent situation; they need only act within the range of conduct [the law identifies] as reasonable." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994); see also Illinois v. Lafayette, 462 U.S. 640, 647 (1983).

In Graham, the Supreme Court noted a number of non-exclusive factors that can be used to determine whether an excessive force claim presents a triable issue: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect posed an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to

evade arrest by flight. 490 U.S. at 396. The standard is one of "objective reasonableness." Id. at 399. In making that assessment, I have to consider the officers' need to make "split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 397. I am to view the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. In addition, although not dispositive, many courts have accepted the common-sense notion that in considering whether force is excessive, one other factor is the severity of any injuries that the plaintiff has sustained. See, e.g., Perez v. Ponte, No 16-cv-645, 2017 WL 1047258, at *18 (E.D.N.Y. Feb. 14, 2017); Cruz v. City of New York, No. 15 Civ. 2265, 2017 WL 544588, at *7 (S.D.N.Y. Feb. 8, 2017); Frego v. Kelsick, No. 11-CV-5462, 2015 WL 4728922, at *9 (E.D.N.Y. Aug. 10, 2015); Evans v. Solomon, 681 F. Supp. 2d 233, 252 (E.D.N.Y. 2010); Garcia v. Greco, No. 05 Civ. 9587, 2010 WL 446446, at *7 (S.D.N.Y. Feb. 9, 2010); Phelps v. Szubinski, 577 F. Supp. 2d 650, 663 (E.D.N.Y. 2008); Bradley v. Village of Greenwood Lake, 376 F. Supp. 2d 528, 535 n. 4 (S.D.N.Y. 2005).

Plaintiff does not undertake much effort to defend her excessive force claim in opposing defendants' motion for summary judgment. Her position is predicated entirely on the alleged illegality of the officers' attempt to enter the subject premises. In other words, her position is that since the police had no right to execute the warrant by entering the premises, they had no right to use any force to move her out of the way when she blocked the entrance and attempted to close the door on them. As described above, the police did have the right to execute the warrant, and thus plaintiff's attempt to obstruct them from their task permitted them to use reasonable force to complete it.

In any event, based on plaintiff's description of the amount of force used, no reasonable jury could find it excessive. First of all, some force had to be used because plaintiff was closing the door in the officers' faces and refusing to let them enter. As plaintiff testified, "[w]hen they realize I won't let them in, so Leahy yanks me out." In other words, Det. Leahy did not pull her out until he realized that she wasn't going to let him in. The only responsive force was to pull her by the upper arm out of the doorway so that the police could get in, and as Det. Leahy was attempting to do so, plaintiff grabbed on to the doorknob to stop him, which required more force to dislodge her.

Her conduct at that point was sufficient to place her under arrest, and that, in turn, required putting her arm behind her back at a small enough angle so that she could not extract it while being handcuffed. Plaintiff testified that putting her arm behind her caused her pain, and indeed it is theoretically possible to break a suspect's arm or dislocate a suspect's shoulder by an excessively applied arm-bar, but, in fact, there was no damage. Police officers cannot be expected to instantaneously calculate the degree of a resisting suspect's flexibility and move the arm to just enough, but no less, of an angle to thwart resistance and permit handcuffing.

In any event, by that point plaintiff had started a melee, kicking at the officers and doing everything she could to prevent them from taking her into custody. And of course the police do not have to stand there and be pummeled. As plaintiff testified:

> They [were] trying to put handcuffs [on me]. Before the handcuffs they were trying to put the handcuffs on me and I won't let them. So when they see I am fighting back, I won't let them put the handcuff[s] on me. They throw me on the floor. They throw me down on the floor and I put my arms under me so they wouldn't get my arms. . . .
>
> Eventually they get one of my hands out and they handcuffed me.

Plaintiff further testified that the police never struck her or kicked her, and agreed that "the only force they used was the force trying to get [plaintiff's] hands out from under [her] stomach to behind [her] back so they could handcuff [her]." It got so difficult that the officers had to lift plaintiff up and carry her down the stairs: "I just wasn't letting them move my feet and stuff. So I was holding onto the stairs, and I had my feet still. So that they won't move it . . . . So, yes, I was resisting." All this time, she was screaming and yelling. She further testified that the officers used no more force than was necessary to carry her down the stairs.

Plaintiff's injuries are also not indicative of excessive force. Shortly after booking, police officers, at her request, took her to the hospital as she was complaining of chest pains. She was examined and given a sedative, based on a diagnosis of minor swelling in one wrist, but no further treatment. She saw her doctor a couple of days after the incident, but he prescribed no medication (although plaintiff continued to take medication that she already had).

This is simply not an excessive force case. It would be unreasonable for a jury to conclude that the officers did anything more than was necessary to gain entry and subdue plaintiff, both of which they were entitled to do.

### III. State Law Claims

Plaintiff also brings numerous state law claims, including a claim for false arrest and false imprisonment. In New York, false arrest and false imprisonment are the same cause of action. See Holland v. City of Poughkeepsie, 90 A.D. 841, 845, 935 N.Y.S.2d 583, 589 (2d Dep't 2011)). A claim for false arrest under § 1983 is "substantially the same" as a claim for false arrest and false imprisonment under New York law. Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003); see also Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012). As explained above, "[t]he existence of probable cause to arrest constitutes justification and is a

complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). Therefore, based on the probable cause analysis outlined above, plaintiff's state law claim for false arrest and false imprisonment is also dismissed.

As to the remaining state law claims (e.g. assault and battery, negligent supervision, etc.), I decline to exercise jurisdiction over them. Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise jurisdiction over any non-federal claims over which it could have supplemental jurisdiction if the court has dismissed all of the claims over which it has original jurisdiction. Having disposed of all of plaintiff's federal claims, it would be inappropriate to adjudicate the remaining state law claims. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) (stating that if the federal claims are disposed of before trial, "the state claims should be dismissed as well."). Therefore, I decline to retain jurisdiction over the remaining state law claims and dismiss them without prejudice.

## CONCLUSION

Defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment in favor of defendants' on plaintiff's § 1983 claims and state law claim for false arrest and false imprisonment. The remaining state law claims are dismissed without prejudice to recommencement in state court.

**SO ORDERED.**

                                                              U.S.D.J.

Dated: Brooklyn, New York
        May 31, 2017